Good morning, Your Honors. Joseph S. Porta, on behalf of the petitioners, Naira and Sargis Piliposyan. This case is before this Court after an affirmance without opinion by the Board of Immigration Appeals, so therefore this Court is required to look at the IJ's decision to make its decision. Here, the decision was basically denied for the primary reason of an adverse credibility determination, primarily based on implausibility, and thereafter, the IJ, assuming credibility, still found that the Piliposyans did not meet a claim for a well-founded fear based upon a nexus to one of the protected grounds. If the Court would indulge me and allow me to work backwards, I would like to assume first that the case is credible. First we have the Piliposyans who the female petitioner, she is the niece of the former head of the KGB of Armenia, who was murdered. Prior to him being murdered, she had learned through overhearing a conversation at her home or at a relative's home that – You know, we do know the facts. I mean, the claim is that the Armenian KGB was looking for these documents. Where is the protected ground here? Well, Your Honor, the protected ground is this – Being a custodian or the suspected custodian of documents that are of some political sensitivity doesn't make one prosecute on a protected ground, right? Not per se it doesn't, but there is case law to that effect. There is the Mimouzian case that's from the circuit. There is – there are also – What does it say? Pardon me? What does it say? It says that if someone does some sort of whistleblowing activities, it's not necessarily on point to the instant matter since the petitioners didn't know. Well, why don't you try something that is on point? There is nothing necessarily directly on point to this situation. But what we do have here is we have agents of the government actively sexually assaulting clients or the petitioners. We have them – We don't grant asylum because the government misleads. It has to be on a basis of a protected ground. Correct, Your Honor. To me, I just don't see the protected ground here, even if we accept your client's story. Isn't this much like Dinu? Do you remember a case by the name Dinu where the guy was suspected of being – having taken part in a massacre at the time of the Ceausescu regime? And we held – they were looking – they – he claimed he wasn't. The government said, yes, we think he was one of the soldiers that shot the demonstrators. And we said that was just an investigation of a crime. I believe, Your Honor, if I may, that's distinguishable on several points. First of all, this circuit has law that says if there's a lack of a legitimate prosecutorial purpose for a government's harassment and interference with a person's life, namely, here, sexual assaults, beatings, hospitalizations, harassment on numerous occasions, surveillance, there is a presumption that the motive is political, first. Second of all, the cases that you're citing – But here you have advanced the motive. And the motive you had advanced is they were looking for these papers that were politically damaging. So it's not a situation where we have to say, gee, we don't know why these people are being harassed. We can therefore infer that they were harassed for one of the protected grounds. Your client has told us why, and it's not a protected ground. They thought she had stuff on the – on the president. So they thought that she had stuff that could be politically damaging. Correct, Your Honor. But in what you were just referring to as an example, you said that the person was had a – that the government had a valid beef with the individual because they were suspected of mass murders. Having information against the government, I believe, takes us into a completely different realm. That information that's politically damaging to the government, that's not necessarily a crime in and of itself. It's not a legitimate prosecutorial purpose. Is this a case of imputed – of imputed political opinion? I would argue that it is. First of all, the Petitioners are – testified throughout their hearing that they were apolitical. Now, they also testified that they were unaware of the contents of this supposed dossier that was in her uncle's possession prior to him being murdered. We don't even know if the document exists, do we? We don't know if it exists, but the government believes the documents exist, and the government believes that the documents are in the Petitioner's possession. Moreover, they believe that they're in the Petitioner's family possession, as is indicated in the record. Several other family members have been granted asylum based on similar reasons. You – your clients have children there, right? Pardon me? Your clients have relatives there. Very few remaining. The majority of their relatives are in the United States now. They do have their children. They have children there. The children, after the first instance of harm, the record shows that after the first instance of harm, they immediately moved their children to elderly, infirm, and I believe the Petitioner referred to her as an invalid relative who's not very able to walk, who lives in a distant province, immediately to avoid any sort of suspicion or any association with the family. And they have remained without significant contact with their family ever since the first instance back in 1996. Other than that – other than that aunt that is disabled, that's taking care of the two children, there's really no other relatives that are referenced that are remaining in Armenia, Your Honor. But the children are there, and they haven't been harmed. Correct. But the children do have a different last name. There was an instance where this Petitioner, Naira, who's the female Petitioner, she has the same last name when she was born as her uncle. Later on, she changed her last names, and then she changed it again when she got married. So the children – the government – the government hasn't necessarily gone after the children, but that's not really dispositive. The people that are specifically being targeted here is Naira and her husband, because the government believes – wrongfully so, but that's irrelevant – that they do possess this dossier – this dossier that contains information that the current president of Armenia – And yet they were allowed to leave the country on their own passports. I believe the male Petitioner's husband was allowed twice to leave, and he was allowed to return and leave again. You'd think that if they were worried about release of these documents, they would think once they came to America, they would release them. Because, of course, here they can't be harmed, and once the documents are released, they can no longer be used as a – as a – you know, something that the government wants. Well, that's an assumption, but there's no substantial evidence to support that assumption. And as a matter of fact, this Court – We do know that your client said they were told, oh, don't you leave the country, don't you even leave the city, and yet they went ahead and they left, and the husband came back, and then they left again. They didn't – they weren't smuggled out in a trunk. They didn't run the border. They didn't swim across the – what is it, the Black Sea or the Caspian Sea, whatever the – I mean, they didn't – you know, they left on a regular passport, on a regular ticket. Your Honor, if I may, a – there's a case law in this circuit as well. It's also the Mimouzian case. I'm going to cite it. I don't believe it was cited in the brief. I was not counseled to brief the matter, but it's 390F3-1129. It's from this circuit from 2004. And I quote – You quote what? Pardon me? What's it called? Mimouzian, M-A-M-O-U-Z-I-A-N. Okay. It is – and I quote – 390F3-1129, did you say? 390F3-1129, Your Honor, yes. I quote, A petitioner's ability to escape her persecutors does not undermine her claim of a well-founded fear of future persecution, even when she succeeds in obtaining government documents that permit her to depart. That's a case that's been decided by – But here, the husband departed, came back, and departed again. Correct, but after he – If they really were worried about making sure they don't release these documents, the last thing they'd want to do is to let them come and go back and forth across the border with no impediment. Your Honor, I believe that's disingenuous to the record. The derivative respondent, Sargis, he came to the United States trying to seek refuge for his family. In the meantime, his wife's only real relative that was remaining there, I believe it was her father, passed away. And he went to help his wife out at that point. And after he returned, he suffered further harm. She suffered further harm. The entire family suffered further harm. So even if that may have wiped out something that happened, they were still subjected to specific – specified attacks directly targeting them for something that – for a political opinion that the government was imputing upon them, which really had no legitimate process for a purpose. You can still see where the IJ looks at this. They claim that they are being prosecuted by the government. They claim – they were told, don't you dare leave the city. And they also show, the record shows, without dispute, that they left with government permission and that the husband actually came back and left again, was allowed to go and come freely twice. Why can't the IJ say, look, we just – I just don't believe the whole story, because what they're telling us about the restrictions placed on them just doesn't square with the known facts? Because the fact that they were able to travel, I do believe it's relevant. But as a blanket statement to throw the entire claim away, I think is completely disingenuous. I believe the judge here, the main problem the judge had was – the main problem – Why is that? Why is it disingenuous to the claim? Because they were – she was, quote, unquote, raped, Your Honor. The fact that he left and he was – She says she was raped, and if she was, it's certainly a terrible thing. But we have to determine – we have her testimony and nothing else. We have to determine whether her story about what happened to her is credible. And we have an IJ who's the Trial Factors there looking and listening and seeing the witness testify. And I gave you an example of a point where he found inconsistency. You know, he – they claim, as part of their story, that they were told you shouldn't leave. And part of their story is they've got these documents that are highly explosive, that could bring down the government. And so if they leave and take them out of the country, that would put them out of their reach and could cause a crisis, because if they release them – if they release them outside the country, they would be out of harm's way. So you would think that if the story is true, the one thing they would not allow these people to do is to leave the country where they could publish these documents. Your Honor, with all due respect, I believe that's based upon speculation. There's nothing here to support that theory. They evaded their captors. They're here. There's nothing to refute any of the harm that they had. There's just the judge's – the I.J.'s speculation from left field saying, you guys managed to get out, so therefore I don't believe anything else that you're saying. There's not substantial evidence supporting that. It was – it was speculation. And the fact that he came back and left again is just speculation? No, that's not speculation. That's a fact. The fact that he came and he left. But there's also another fact in there, which is he was harmed upon his return. Second of all, there's also testimony in the record that has not been refuted that he paid to leave. How do we know that he was harmed? Pardon me? How do we know he was harmed? How do we know he was harmed? Well, he gave – his wife gave detailed credible – or detailed testimony and so did he. And under the regulations, all you need is detailed credible testimony to be able to establish a claim for persecution. Because persecutors don't give you a note attesting to their persecution, it's very difficult to satisfy the refugee laws in this country without having to take a person's claim. They are not armed with a document that puts them in the position that they're in. They're here fleeing persecution. They have relatives here who could have provided supporting affidavits. That's correct. But they didn't. No, they did not, Your Honor. I – Have you read our opinion in SIDU? S-I-D-H-U? I have, Your Honor. I've read the decision in SIDU. All I can say with respect to that was the attorney at the trial level attempted to submit information regarding this in doing a proffer. The proffer is contained at page – if you bear with me for a second. The proffer is contained at page 115 of the certified administrative record. And what does it say? Well, it says, The proffer basically is that the Respondent's cousins also came to the United States. They fled Armenia. They applied for asylum about two or three years ago, and they were both granted. Actually, it was three individuals. They were all granted asylum based on the same set of offense – events, pardon me, and by the United States government. And again, based upon their relationship with this individual who was murdered, the head of the KGB. So just based on that, I know it's not – doesn't per se, you know, require a grant of the Respondent's case. But the relevance is that if the U.S. government grants asylum to an individual based on a certain set of facts, and then you have someone else, a relative who's applying for asylum, again based on the same set of facts, based on the family relationship, I think some kind of – it is some kind of inconsistency for one family member to be granted asylum and the other one to be denied. The judge denied – Where is the proffer? The proffer was basically about the – the – Do you know what the word proffer means? It means to basically submit testimony on behalf of somebody, is my understanding of the word proffer. To offer to present evidence. Okay. Okay. What is the evidence that he offered to present? The evidence – Did he say, I have affidavits here from the cousins? No, Your Honor, he did not. If – Did he say, I have the cousins waiting outside to come in and testify? No. That's a proffer. If I may – That's a proffer. Having a lawyer stand up and talk is not a proffer. I understand, Your Honor. Now, if I may, in immigration context, when somebody has been granted asylum, the only way that you can have that person testify in court is to have that person affirmatively sign a waiver of confidentiality regarding their asylum claims, thus putting them in jeopardy after being here safe – in a safe haven and possibly being denied asylum. Possibly jeopardizing their official claim. There's no indication of that in the record, but that is the common practice in the immigration courts. I don't know why they were not called. I was not the trial counsel. I can only speculate as to that, but I believe that the family members faced with that situation and faced with the decision that they may have to waive their own claims and put themselves in harm's way probably were not willing to waive the confidentiality of their asylum application and come to court to testify. Based on that, I say they're not reasonably available or easily available. I thought that these were cousins who had already gotten asylum. Correct, Your Honor, but in order for them to testify or to even mention any circumstances of their application, they have to sign a confidentiality agreement, basically allowing the government to get another bite at whether their claim is true or not. And if something comes up and it was inconsistent or for some reason something gets misstated, their asylum can be revoked. I think that takes us out of the realm of an easily available witness and is also distinguishable from sit-in. Well, this is the first I've heard of that. I'm not sure it makes any sense. Okay. We'll hear from the government. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Eric Marsteller for the United States. The record in this case. Anything here that you've heard this morning not adequately covered by your brief? I don't believe so, Your Honor. I would like to ask one question, Mr. Marsteller. You heard Judge Kaczynski ask opposing counsel what the protected ground was here. Now, as I look at the government's brief, I see that you have tried to uphold the judges, the IJA's findings on credibility, but I didn't see that the government argued that there was no protected ground here. Is it the government's position that there is no protected ground available here? Assuming that they were credible, is there a protected ground? The immigration judge in his decisions only stated conclusively that the petitioners have not met their burden of establishing by credible, direct, and specific evidence that they experienced past persecution based upon any of the alleged protected bases. So the immigration judge did not specifically address in more detail whether there was a protected ground. So it's not the government's position here. If we thought that there was not a protected ground, then that is a matter from which we'd have to remand back to the Board. Is that right? I believe if this Court was to base its decision on that, if the Court found that the credibility alone was insufficient, then I believe the immigration judge's decision on the protected ground was not sufficient for this Court to review it, and it should be remanded for further consideration of the protected ground basis. Thank you. Thank you, Your Honor. Here's just how you would have submitted.
judges: Kozinski, O'scannlain, Bybee